**Below is a Memorandum Decision of the Court.**

*Mary Jo Heston*

**Mary Jo Heston**
**U.S. Bankruptcy Judge**

**(Dated as of Entered on Docket date above)**

# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

ERIC RON ENGELLAND,

       Debtor.

Case No. 24-40448-MJH

JOSPEH M. HALE and LAUREL A. HALE, husband and wife,

       Plaintiffs,

   v.

ERIC ENGELLAND and CHARLENE ENGELLAND, husband and wife,

       Defendants.

Adversary No. 24-04031-MJH

**MEMORANDUM DECISION**
**Not For Publication**

This matter came before the Court for trial on October 22, 2025, on a complaint filed by Plaintiffs, Joseph Hale ("Mr. Hale") and his wife Laurel Hale ("Mrs. Hale") (collectively "Plaintiffs"), against Eric Engelland ("Mr. Engelland" or "Debtor") and his wife Charlene Engelland ("Mrs. Engelland") (collectively "Defendants") seeking the nondischargeability of debts pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).[1] Plaintiffs appeared at trial through

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Federal Bankruptcy Code, 11 U.S.C. § 101–1532, and to the Federal Rules of Bankruptcy Procedure, 1001–9037.

their counsel, Snyder Law Firm, LLC and Klaus O. Snyder. Defendants appeared at trial through their counsel Allen Carlson PLLC and Christopher E. Allen. Based on the evidence, arguments of counsel, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

## I. PROCEDURAL HISTORY

On May 31, 2024, Plaintiffs timely filed a complaint against Defendants seeking a determination that certain amounts owed to Plaintiffs related to the renovation of their home are nondischargeable under § 523(a)(2)(A) and (B). Pls.' Compl., ECF No.1.

On September 12, 2024, Plaintiffs moved for a default judgment against Defendants for failing to file an answer. Pls.' Mot., ECF. No. 5.[2] The Court entered an order to show cause for lack of prosecution on September 26, 2024. ECF No. 8. At the October 23, 2024 hearing, where only Debtor appeared pro se, Plaintiffs were ordered to note their motion for default on 21 days' notice to give Defendants an opportunity to obtain counsel. ECF No. 13. Defendants filed an answer through their counsel on November 20, 2024, and Plaintiffs withdrew their motion for default. Defs.' Answer, ECF No. 17.

Trial began on October 22, 2025, and concluded on November 21, 2025. ECF. Nos. 51; 58. Plaintiffs sought nondischargeability of debt plus the award of attorney's fees pursuant to the terms of the Homeowner Agreement FHA 203(k) Rehabilitation Program contract ("203(k) Contract"). The two main issues presented to the Court were whether, pursuant to § 523(a)(2)(A): (i) Debtor had a general intent not to pay certain subcontractors and materialmen, and (ii) Debtor obtained draw funds under the 203(k) Contract by fraudulently mispresenting that certain subcontractors and materialmen were paid according to the contract's terms. After Plaintiffs rested their case, Defendants

---

[2] Plaintiffs did not seek a default judgment against Mrs. Engelland because she had not been personally served. There is no indication in the record that Mrs. Engelland was subsequently personally served. Nonetheless, she is deemed to have waived insufficient service by failing to raise this defense in the Answer filed by her and Debtor. *See* Fed. R. Civ. P. 12(h)(1), made applicable by Fed. R. Bankr. P. 7012; Defs.' Answer, ECF No. 17.

moved for dismissal of Plaintiffs' § 523(a)(2)(A) and (B) claims for relief under Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52(c). This Court made an oral ruling dismissing Plaintiffs' claim for misrepresentations under § 523(a)(2)(B) based on the Plaintiffs' failure to prove essential elements of their claim, but denied dismissal of Plaintiffs' § 523(a)(2)(A) claims. Defendants thereafter presented their case. The Court heard closing arguments on November 21, 2025, and took the matter under advisement.

## II. FINDINGS OF FACT

### A. Chapter 7 Bankruptcy Proceeding.

Debtor filed his bankruptcy petition under chapter 7 on February 29, 2024. Bankr. Case No. 24-40448-MJH, ECF No. 1. Co-defendant, Mrs. Engelland, did not file bankruptcy. Debtor is the sole owner of Coba Construction LLC ("Coba"). Bankr. Case, ECF No. 1. The schedules listed Plaintiffs' claim as an unsecured claim in the amount of $151,731.00 and identified it as a "business liability." Bankr. Case, ECF No. 1. Plaintiffs filed a proof of claim on May 3, 2024, in the amount of $153,000.00, stating as its basis the "[u]njust enrichment and fraud from monies paid for services." Bankr. Case, Claim 7-1. Debtor was granted a discharge on September 26, 2024. Bankr. Case, ECF No. 37. Before discharge, Plaintiffs filed this adversary proceeding on May 31, 2024.

### B. The Dream Home in the North End Neighborhood of Tacoma, Washington.

Plaintiffs both worked in positions within the technology industry and had no expertise in home renovation or construction. In late 2022, Mrs. Hale was diagnosed with breast cancer, and in February 2023, Plaintiffs bought a single-family residence located at 4716 N. 45th St., Tacoma, WA ("Home"). Mr. Hale described the Home as their future "dream home." The Home was over a century old and needed major renovations for it to be habitable.

Plaintiffs used a Section 203(k) Rehabilitation Mortgage loan backed by Federal Housing Authority Mortgage Insurance that allowed them to finance both the purchase

price of the Home as well as the cost of certain renovations within a single long-term loan. The total loan amount was secured by the Home as renovated and based on its value.

Plaintiffs' 203(k) lender was Fairway Independent Mortgage Corporation ("Lender"). Under the 203(k) process, Plaintiffs were required to hire a certified Federal Housing Authority inspector to act on their behalf in certifying the 203(k) renovation loan disbursements and inspecting the work of a hired contractor. In December 2022, Plaintiffs' realtor requested Roger Merrell, a Housing and Urban Development inspector with the required credentials, to inspect the Home. In January or February 2023, Merrell prepared a Preliminary Deficiency & Compliance Report and Specification of Repairs ("Deficiency List"). Pls.' Exs. 4–5. Merrell's Deficiency List set out line-items of repairs needed for the Home to meet minimum building code standards. Through Lender's network, Plaintiffs met Debtor and agreed that Debtor's company Coba would renovate the Home using the Deficiency List under the 203(k) Contract.

## C. The 203(k) Contract Between Plaintiffs and Coba.

Plaintiffs and Debtor, through Coba, entered into the 203(k) Contract to rehabilitate the Home. Project completion was set for no later than six months after closing unless delayed beyond Coba's control. Plaintiffs expected the first phase of the Home project to be completed prior to Mrs. Hale's last chemotherapy treatment so that she could enjoy the primary bedroom area when she moved in. It is undisputed that the Home project was under demanding time constraints.

The original 203(k) loan amount was $151,730.80 and was supported by the Deficiency List. The Deficiency List contained line-items with specific threshold budgets (e.g., $19,261.00 for cleanup, $1,551.00 for windows, $7,700.00 for electrical, etc.) that Coba needed to complete for the Home to comply with minimum building code standards. Within the Deficiency List's "cleanup" line-item, there were sub line-items like: "general" for $2,640.00; "hazmat demo," which included asbestos and lead abatement, for $9,251.00; and "demo" for $7,370.00. If a certain line-item or outside cost ran over budget,

there was a contingency of $15,173.18[3] to cover those unplanned expenditures. The Court found Debtor's testimony credible as he explained that the budget provided by the 203(k) Contract was insufficient for the scale of renovating a 100-year-old home and that he informed Plaintiffs and Merrell about his concern that additional funds would be needed for this reason. Another reason for additional funds was because Plaintiffs had "wants" outside the scope of the 203(k) Contract's renovation loan for a primary bedroom with a bathroom and closet space, which were expected to be completed in time for Mrs. Hale's homecoming. Later in the Home project, additional funds were added to the 203(k) Contract's loan to address certain unforeseen issues including an unexpected roof issue, increasing the contract total to $181,384.00[4]. Still, the 203(k) loan proceeds were not enough for Coba to feasibly address all the structural needs and Plaintiffs' "wants" to complete the first phase of the Home renovation described below.

**D. The Home Project's "Phase 1" Work Within the Scope of the 203(k) Contract and Outside It.**

Debtor did not have a concrete architectural plan or design provided by Lender, Merrell, or Plaintiffs. Debtor realized the Home project's challenges when trying to accommodate the structural engineering overhaul and Plaintiffs' "wants." Debtor put together a general plan for the 100-year-old Home addressing the insufficient budget and its tight timeframe. To commence work before the availability of the 203(k) Contract's funds, Debtor drafted an initial funds agreement that ran parallel with the scope of the 203(k) Contract. Pls.' Ex. 42. The initial funds were used to supplement costs for architectural design, structural planning, window and exterior siding repair, and abatement. It is not disputed that Plaintiffs were to pay Coba an additional $32,500.00

---

[3] The contingency budget was 10% of the 203(k) Contract loan amount.

[4] There was no testimony regarding the exact date of when the budget increased, but Plaintiffs' Exhibits 17–18 show that the budget increase occurred sometime between the release of Draw 2's funds and the Draw 3 request.

in initial funds to supplement the Home project's insufficient funding. Plaintiffs, by email, agreed to pay Coba the total amount of the initial funds, and they paid $22,500.00 upfront. Plaintiffs never paid the remaining $10,000.00. Nonetheless, the initial funds for the specific items together with the 203(k) Contract amount were insufficient to complete Phase 1 on the 100-year-old home.

The 203(k) Contract and work performed outside the 203(k) Contract's scope shaped Phase 1 of the Home project. Plaintiffs disputed Phase 1's scope, believing that the only governing documents were the Deficiency List and the scope of work under the 203(k) Contract. Plaintiffs argued that work outside the scope of the 203(k) Contract was also governed by the 203(k) Contract. But the Court finds that the scope of Phase 1 encompassed funds for work designated under the 203(k) Contract, work funded by the initial supplemental funds, and other necessary work outside the 203(k) Contract's scope that Coba performed to complete Phase 1. Thus, over the course of the Home project, Phase 1 included work performed without a contract or agreement in place, and such work was necessary in order for the 100-year-old Home to be structurally sound and meet Plaintiffs' "wants" for Phase 1.

**E. The Draw Process under the 203(k) Loan Contract.**

Over the course of Coba's work on the Home from April to August 2023, there were three draws for work performed under the 203(k) Contract: Draw 1, Draw 2, and Draw 3. The procedure for such draws was as follows: Coba sent invoices to Merrell, who inspected the work onsite. Merrell would affirm the work and reflect 100% payment for draw items that were fully completed on the Deficiency List. Pls.' Exs. 16–17. The dollar amount corresponding to each approved line-item would be disbursed, and if an unexpected cost arose outside the line-item, the contingency fund was used to cover it.

Draws 1 and 2 contained standard conditional waiver releases from Merrell Inspection Services LLC (Merrell's inspection company) ("MIS Waivers"). Pls.' Exs. 16–17. By signing the MIS Waivers, Debtor agreed "this document shall become effective to

release pro tanto any mechanic's lien, stop notices or bond right the undersigned has on the job of [Plaintiffs] located at [Home] to the following extent." Pls.' Ex. 16. The MIS Waivers contained additional language as follows: "release covers a progress payment for labor, services, equipment, or materials furnished to: [Plaintiffs] through to [Date]. This release covers the final payment to the undersigned for all labor, services, equipment, or material furnished on this job." Pls' Exs. 16–17.

A dispute arose during trial regarding the interpretation of the MIS Waivers. Plaintiffs interpreted the MIS Waivers as a representation that Debtor *had paid* the subcontractors and materialmen prior to making the respective draw request. (emphasis added). Merrell testified that the MIS Waivers' language meant that the funds released for Draws 1 and 2 would be *used* by Debtor to pay for the subcontractors and materialmen. (emphasis added). The Court finds Merrell's interpretation to be the correct interpretation of the MIS Waiver language for Draws 1 and 2.

Draw 3's waiver ("Lender's Waiver"), which was prepared and provided by Lender, was different from the MIS Waivers' terms. Under Lender's Waiver, a definition of "work" was provided unlike in the MIS Waivers. "Work" was defined as construction, repair, and/or replacement of improvements on the real property. Pls.' Ex. 55. Lender's Waiver further stated the contractor represents and warrants that:

> [A]ll persons or entities who furnished services, labor or materials to [c]ontractor in connection with the Work *have been paid* all amounts to which they have or may become entitled, therefore, and . . . [c]ontractor's portion of the Work is fully completed in accordance with the final plans and specifications . . .

Pls.' Ex. 55 (emphasis added). The Court finds that the Lender Waiver's definition of "work" covers only work on the Home under the scope of the 203(k) Contract spanning Draws 1–3 but not work performed outside of the 203(k) Contract.

## F. Breaking Ground and the Execution of Draw Requests.

In April 2023, Coba broke ground on the Home project for Phase 1. Coba submitted a draw request on May 3, 2023. Debtor invoiced $67,145.13[5] for work performed on Draw 1. The invoice included non-hazmat testing and reporting, sewer scope, asbestos abatement, as-built plan by architecture and design, structural engineering, non-hazmat demolition, and permitting. The invoice was sent to Plaintiffs, Lender, and Merrell. Plaintiffs testified they received the invoice and were aware of the costs.

The aforementioned work performed was extensive, but Debtor's invoiced line-items were funneled on the Deficiency List as line-items for cleanup and miscellaneous. Coba's employees completed all the work included on the invoice other than the asbestos abatement, which was performed by Northwest Abatement. Coba's invoice showed that Coba completed $27,102.00 worth of work, while Northwest Abatement completed $33,800.00 for asbestos abatement, significantly in excess of the $9,251.00 estimated for asbestos abatement in the 203(k) Contract. Pls.' Exs. 5; 16. Merrell inspected the work and affirmed 100% completion for cleanup and miscellaneous in the amount of $19,811.00. In addition, the $14,480.00 was disbursed from the contingency fund for engineering and permitting costs.

The Draw 1 disbursement was $34,291.00. This was $32,854.13 less than the amount invoiced by Coba. Nevertheless, Coba continued to work on the Home and signed Draw 1's MIS Waiver. Coba did not pay Northwest Abatement's bill of $33,800.00, nor did Coba remit any of the $9,251.00 allotted funds for "hazmat demo" to them, although Debtor testified that all draw funds were contributed to the Home project.

On June 13, 2023, Coba submitted a second draw request. Coba invoiced an additional $61,456.34 for Draw 2. The invoices again were sent to Plaintiffs, Lender, and Merrell. Coba completed all the work for Draw 2, and Merrell inspected the 203(k)-related

---

[5] The Court was provided Pls.' Ex. 16 in physical form. Due to the invoice's faint print, the total reads as either $67,143.13 or $67,145.13. The Court reads the total invoice as $67,145.13.

work and indicated that 100% was complete per job line-item. But due to an uncovered roof area needing repair, $12,950.00[6] was utilized from the 203(k) Contract contingency to cover this cost, substantially depleting it. Testimony by Merrell and Coba's former employee, Shane Murray, stated that projects like Plaintiffs' Home can vary drastically and be a "can of worms." The unexpected repairs and reworkings of the project raised Coba's costs, yet Lender only disbursed $24,155.00 for Draw 2. Pls.' Ex. 17:5. Lender was short on Coba's invoice again. Debtor signed Draw 2's MIS Waiver and received the shorted payout. Coba continued to work on the Home albeit being short $37,301.34 for Draw 2. The total balance due to Coba at this time was $70,155.47.[7]

Coba submitted a third draw request on July 24, 2023. For Draw 3, Coba invoiced an additional $117,179.25[8] and completed work on exteriors, windows, partition walls, and the basement. Pls.' Ex. 18:6. Coba subcontracted for plumbing, electrical work, and heating, and Coba did the underlying preparation work for these subcontractors. Coba hired a plumbing subcontractor for $8,272.50 and also purchased materials from a window supplier. Pls.' Ex. 83. Plaintiffs, Merrell, and Lender were given an invoice from Debtor, and Plaintiffs acknowledged receipt of the invoice. Plaintiffs testified they received the invoice and took issue with large costs on the project. According to Merrell, all work invoiced for the 203(k) Contract draw items were inspected, completed, and allotted their full 203(k) Contract line-item amounts, including plumbing ($18,532.00[9]), electrical ($7,700.00), and heating ($4,820.00[10]).

---

[6] Exhibits provided during trial show that another $12,950.00 was allocated as a contingency cost for the uncovered roofing repair on Draw 2, although the record shows that the contingency was nearly depleted after Draw 1. The Court is aware of the inconsistent budget representations; there was no testimony explaining the contingency's budget increase between Draws 1 and 2.

[7] Total sum of unpaid invoice amounts for Draws 1 and 2.

[8] Lender edited the invoice to add $20.00 for work performed on heating, increasing the invoice amount from $117,159.25 to $117,179.25. Pls.' Ex. 18:6.

[9] Debtor hired a subcontractor named Rick the Plumber who invoiced $8,272.50.

[10] After Debtor was fired, Plaintiffs readjusted the Deficiency List's line-item allotment for heating to $36,551.20 and expensed the remaining $31,731.20 on their fourth draw. See Pls.' Exs. 18–19.

On August 7, 2023, Debtor signed the Lender's Waiver, acknowledging Lender's Waiver language that all subcontractors and materialmen "have been paid all amounts" owed on the Home project. Coba did not pay Draw 3's subcontractors in full prior to receiving the funds and as of that date had not paid Northwest Abatement in any amount. Also, Coba did not pay $862.54 to a window supplier for materials. Draw 3 disbursed $46,815.00 to Coba, resulting in a total accumulated shortage of $70,364.25 owing to Coba for work performed outside of the 203(k) loan. Debtor testified he had a conversation with Plaintiffs about being short $70,000.00 and expressing hope that they could cover the shortage when they sold their other home or from anticipated bonuses. Plaintiffs acknowledged the shortage and that they were trying to sell their other home to "close the gap entirely." Pls.' Ex. 13. In the meantime, Plaintiffs informed Debtor they wanted to pause work to get him caught up on payments through draw funds and to clarify the remaining scope of work. *Id.*

## G. Coba is Fired and Allegations of Fraud against Debtor.

On August 16, 2023, Plaintiffs received an email from Northwest Abatement that they were going to place a lien on the Home because they have not received any payment on their invoice from May 16, 2023. On August 17, 2023, Northwest Abatement filed a notice of a claim of lien on Plaintiffs' Home for $33,641.50[11]. The same day Plaintiffs received Northwest Abatement's email, Plaintiffs fired Coba. At trial, Plaintiffs testified they were disgruntled by the progress on the Home project, considering the six-month deadline under the 203(k) Contract and Phase 1's completion for Mrs. Hale's homecoming. Debtor emailed and called Plaintiffs, and during trial testified, that at that time he was still willing to work on the Home project, but they rejected his offer.

Around the time Coba was fired, multiple employees quit Coba. Testimony by former Coba employees Lauren Martin, Josh Ord, and Shane Murray explained that they left

---

[11] Northwest Abatement's invoice was $33,641.50. Coba invoiced abatement performed by Northwest Abatement for $33,800.00.

Coba because Debtor informed them that funds were tight, Debtor was not able to pay for supplies on the Home and other Coba projects, and that certain subcontractors and materialmen were not yet paid the amounts owed to them. Mr. Hale testified that Debtor told him that he paid the subcontractors what they were owed. Debtor testified that his general comments to Mr. Hale were that subcontractors would get paid and Debtor would make sure of it. Debtor acknowledged through testimony that it was likely that Mr. Hale understood his general comments to mean that Debtor would take care of it, assuring him that there was nothing to worry about. Debtor further testified that he believed he would be able to pay subcontractors what they were owed because the work on the invoices was completed, but because Lender and Plaintiffs did not pay Coba and Debtor, Debtor ultimately could not pay the subcontractors.

Plaintiffs testified that they did not want to continue working with Debtor or Coba due to the lien, nonpayment of certain subcontractors and materialmen, and failure to meet prompt deadlines. At the time Coba was fired, Coba had not paid draw amounts obtained through the 203(k) Contract to four subcontractors—Northwest Abatement, plumbing, heating, and electrical—and one materialman for window supplies, totaling $30,906.04. After Coba was fired, Plaintiffs had approximately $76,000.00[12] in loan funds remaining on the 203(k) Contract to complete the rest of the required work to meet building codes and address the Deficiency List.

Plaintiffs continued with the Home project and removed Northwest Abatement's lien from their home, though there was no testimony in the record about whether or how such lien was satisfied or why it was withdrawn. Multiple subcontractors who were not paid for work within the scope of the 203(k) Contract contacted Plaintiffs and threatened to

---

[12] There was no testimony about how much specifically remained on the 203(k) Contract's loan amount. The Court subtracted all draw disbursements to Coba from the total revised budget of $181,384.00, leaving $76,123.00. *See* Pls.' Exs. 16–19; 55.

place liens on their Home. Plaintiffs paid such subcontractors out of pocket as more fully set forth below.

Plaintiffs allege that Debtor's individual conduct, through Coba, was a fraudulent misrepresentation of his duties under the 203(k) Contract. They argue that Debtor fraudulently obtained funds through the 203(k) Contract, that Debtor's work performed caused superfluous expenses on the Home project, and that Debtor intended to keep the funds without paying certain subcontractors or materialmen. Conversely, Debtor stated that he was working on paying those subcontractors and materialmen but could not pay them timely because he struggled with cash flow problems due in part to Lender's draw shortages on a 100-year-old home renovation and Plaintiffs' failure to pay such shortages on the invoices.

During trial, Plaintiffs' presented an exhibit that listed their total damages amount at $66,619.96. Pls.' Ex. 113. During closing arguments, Plaintiffs further elaborated that $41,621.70 are nondischargeable damages. Debtor asserted consistently throughout trial that Coba was owed approximately $70,000.00 for unpaid work performed on the Home.

### III. DISCUSSION

**A. Jurisdiction.**

This Court has jurisdiction over the adversary proceeding under 28 U.S.C. § 1334(b). A bankruptcy court has jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Specifically, bankruptcy courts have exclusive jurisdiction to determine the dischargeability of debts under § 523(a)(2), (a)(4), and (a)(6). *See In re Everly*, 346 B.R. 791, 796 (B.A.P. 8th Cir. 2006).

**B. Dismissal of Mrs. Engelland from Adversary Proceeding.**

Plaintiffs commenced this nondischargeability proceeding against both Debtor and Mrs. Engelland, Debtor's non-filing spouse. The Court concludes that Plaintiffs have presented no legal or factual grounds to support a nondischargeability determination against Mrs. Engelland. Mrs. Engelland is not a debtor in this bankruptcy case, and thus

not subject to a nondischargeability determination. Additionally, Plaintiffs have failed to allege, let alone establish, any involvement by Mrs. Engelland with the Home project or any fraudulent conduct by her, either under § 523(a)(2)(A) or (B). All claims asserted against Mrs. Engelland are dismissed with prejudice.

**C. Pleadings Are Amended to Conform to the Evidence and Defendant Added.**

During the course of litigation, Debtor repeatedly argued and presented supporting evidence that Coba was owed at least $70,000.00[13] for work performed on the Home that was never paid by Plaintiffs. When Debtor asserted this defense, which the Court views as a recoupment defense, Plaintiffs did not object, but rather litigated the issue during trial and closing, arguing that (1) Debtor and Coba assumed the risk for expenses accrued outside of the 203(k) Contract budget and that Plaintiffs were not liable for them, and (2) Debtor was fraudulently deceptive by taking draw funds and not using them as intended. The Court must determine whether, pursuant to Fed. R. Civ. P. 15(b), the pleadings should be constructively amended to conform to the evidence presented and whether Coba should be added as a defendant to this proceeding, pursuant to Fed. R. Civ. P. 21.

Under Fed. R. Civ. P. 15(b)(2), made applicable by Fed R. Bankr. P. 7015, when an issue is not raised by the pleadings but is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. Consent is found when evidence is introduced with no objection. *See In re Vickery*, 488 B.R. 680, 694 (10th Cir. BAP 2013). Implied consent is found when a party either introduces evidence on the new issue or fails to object when the opposing party introduces such evidence. *Id.* (citing *Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1280 (10th Cir.2004)). The trial court has broad discretion when conforming to pleadings with the evidence presented. *See id.*; *see also In re Crawford* 841 F.3d 1, 6 (1st Cir. 2016) (where the court

---

[13] The Debtor did not assert a specific dollar amount, but the record before the Court supports Coba's argument that it is owed at least $70,000.00. Additionally, the evidence shows that the value of the work performed by Coba far exceeds the amount Plaintiffs paid Coba under the 203(k) Contract and initial funding agreement.

found that there was implied consent under Fed. R. Civ. P. 15(b) because the debtor did not object and failed to object to the unpleaded claim); *Miller v. Mills Const., Inc*, 352 F.3d 1166, 1171 (8th Cir. 2003) (where court found that debtor did not expressly consent to try the issue of the breach of contract, but nevertheless, consent may be implied from its failure to object to the introduction of such evidence).

Here, Plaintiffs impliedly consented to litigating whether Coba was still owed at least $70,000.00 for work performed on the Home. Debtor made this argument in his trial brief, during opening statements, and during his testimony. From October 10 to November 21, 2025, Plaintiffs were aware of this issue and did not object to it on the record. More so, during closing arguments, Plaintiffs made arguments against Debtor's claim that Plaintiffs still owed Coba $70,000, without objecting to the issue being raised. Because the issue was raised multiple times throughout the course of the trial without objection by Plaintiffs, and Plaintiffs presented counterarguments against the defense, the Court concludes that pursuant to Fed. R. Civ. P. 15(b), the pleadings should be constructively amended to include what is effectively a recoupment defense to Plaintiffs' claim for nondischargeable damages, thereby conforming the pleadings to the evidence admitted. *See In re Vickery*, 488 B.R. at 694.

The Court also has authority, on just terms, to exercise its discretion to add or drop a party under Fed. R. Civ. P. 21, made applicable by Fed. R. Bankr. P. 7021. *See Mendoza v. Nordstrom, Inc.*, 865 F.3d 1261, 1266 (9th Cir. 2017) (citing *Rush v. Sport Chalet, Inc.*, 779 F.3d 973, 974 (9th Cir. 2015) (court's decision to dismiss a defendant under Rule 21 is reviewed for abuse of discretion)). A court may exercise its discretion under Fed. R. Civ. P. 21 sua sponte at any time. *See Campos v. Fresno Deputy Sheriff's Ass'n*, 535 F. Supp. 3d 913, 928 (E.D. Cal. 2021).

Plaintiffs commenced this adversary proceeding against Debtor and his wife only, not Coba, even though the contracting parties were Plaintiffs and Coba, and all damages Plaintiffs incurred related to work performed on the Home by Coba. Because the

Plaintiffs' claims for damages for work performed on the Home were not previously liquidated, in order to prove their damages element under § 523 at trial, Plaintiffs were required to establish their damages against Coba. While Debtor did the work on the Home, Debtor consistently argued that it was his 100% owned entity, Coba, that was owed money by Plaintiffs, and the parties presented evidence to this effect. Because a recoupment defense necessarily belongs to Coba as the contracting party, the Court concludes that adding Coba as a defendant to this proceeding reflects the case as it was actually litigated, and thus is the just result. Accordingly, Coba is added as a defendant to this proceeding.

**D. Washington State Participation Liability Applies to Debtor.**

Plaintiffs allege that Debtor is personally liable for any nondischargeable debt under § 523(a)(2)(A) for alleged misrepresentations made, although Coba was the entity performing under the 203(k) Contract and all of Plaintiffs' damages arose from Coba's renovation of the Home. The Court must determine whether Debtor has potential participation liability through Coba and may be subject to personal liability under § 523(a)(2)(A) before turning to the elements of Plaintiffs' claims.

Officers are personally liable for the torts of corporations when officers knowingly commit wrongful acts or direct others to do so knowing the wrongful nature of the requested acts. *See Annechino v. Worthy*, 175 Wash.2d 630, 637 (2012); *see also Dodson v. Economy Equip. Co.*, 188 Wash. 340, 343, 62 P.2d 708 (1936) (finding president and general manager liable when they had directly participated in conversion of property); *see also Johnson v. Harrigan-Peach Land Dev. Co.*, 79 Wash.2d 745, 753, 489 P.2d 923 (1971) (finding officers liable when they participated in fraudulent acts and maintained close control). "This liability does not depend on piercing the corporate veil." *R.N. v. Kiwanis Int'l*, 19 Wash. App. 2d 389, 410, 496 P.3d 748, 760 (2021) (citing *State v. Ralph Williams' N. W. Chrysler Plymouth, Inc.*, 87 Wash.2d 298, 322, 553 P.2d 423, 439–40 (1976). When determining whether a corporate officer should be liable for statements

constituting misrepresentation, the evidence must support a factual finding that the corporate officer participated in, or knew of, the issuance of the allegedly fraudulent statement, or approved or sanctioned it. *Crescent Mfg. Co. v. Hansen*, 174 Wash. 193, 198, 24 P.2d 604 (1933); *see also Dodson*, 188 Wash. at 342-343 (where the Washington Supreme court held that the president and general manager was personally liable for conversion of an ice machine because he directly assisted in the conversion); *Johnson*, 79 Wash. at 753 (where the court held that the corporate officers were liable for misrepresentations and fraud because the evidence strongly showed that they knowingly participated in and directed the fraudulent activity).

Here, the Court finds that Debtor is subject to potential participation liability for alleged misrepresentations because of his direct and exclusive control over Coba while working on the Home project. Debtor is the sole owner of Coba and has exclusive control over the entity, manages and coordinates projects like the one at issue, and employs Coba's employees. Regarding the Home project, Debtor signed the 203(k) Contract, represented that all subcontractors and materialmen were paid, and personally signed all waivers. Based on the evidence before the Court, the Debtor had exclusive control over Coba during the Home project and was the sole participant in the alleged fraudulent conduct. Therefore, Debtor is subject to participation liability and may be personally subject to a nondischargeability determination under § 523(a)(2)(A), even though Coba was the entity that entered into the 203(k) Contract.

**E. Nondischargeability under § 523(a)(2)(A) in General.**

Plaintiffs present two main theories for Debtor's nondischargeable liability: (i) Debtor had the general intent not to pay certain subcontractors and materialmen employed to renovate the Home; (ii) Debtor obtained funds under the 203(k) Contract by fraudulently mispresenting that four subcontractors and one materialman were fully paid according to the contract's terms. The Court will address these issues separately.

Section 523(a)(2)(A) states:

> A discharge under sections 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The creditor bears the burden of proving the applicability of § 523(a)(2)(A) by a preponderance of the evidence. *In re Sabban,* 600 F.3d 1219, 1222 (9th Cir. 2010); *see In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000)). The Ninth Circuit Court of Appeals has consistently held that to prevail on a § 523(a)(2)(A) claim the creditor must demonstrate by a preponderance of the evidence that: (1) the debtor made representations; (2) that at the time he knew were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. *Id.* (citing *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996)).

### 1. *Alleged Fraudulent and General Intent to Not Pay Subcontractors and Materialman.*

Under Plaintiffs' first theory for relief under § 523(a)(2)(A), Plaintiffs allege that Debtor ran up costs for his self-benefit without the intent to pay the costs associated with the Home renovation including the four subcontractors and one materialman. Plaintiffs have failed to satisfy their burden of proof that Debtor had the general intent not to pay expenses related to the Home project under any of the § 523(a)(2)(A) elements. Debtor did not simply run up costs, but rather, costs increased due to the difficulties of renovating a 100-year-old home under the 203(k) Contract's budget constraints. Although Debtor did not pay certain subcontractors or materialmen, the Court finds that all draw funds went towards the Home project to Plaintiffs' benefit. Debtor was communicative about the costs to Plaintiffs, although new costs arose as the project faced ongoing

problems. Merrell testified that the work completed by Coba was satisfactory under the 203(k) loan and without deficiencies. Also, Debtor continued to work on the project, despite Plaintiffs' failure to pay amounts owing in excess of the 203(k) draws including the outstanding amount of $10,000 agreed to in the initial funding agreement. *See In re Shaul*, 579 B.R. 231, 242–243 (Bankr. D. Or. 2017) (where the court found that when a contractor increased the costs of the project to improve the quality of renovations, there is no intent to deceive when the contractor continued to work on the project); *see also In re Storer*, 380 B.R. 223, 235 (Bankr. D. Mont. 2007) (where the court did not find a debt to be nondischargeable when the professional contractor–debtor obtained draw funds, missed the mark with his bid, and quit because he could not complete the project). Lastly, Debtor testified that after Plaintiffs fired him, he continued to contact them trying to resolve differences and hoped to continue working on the Home project. Thus, under § 523(a)(2)(A), Plaintiffs failed to meet any of the elements pertaining to the allegation that Debtor ran up costs for his self-benefit without the intent to pay the identified subcontractors and materialmen.

### 2. Alleged Fraudulent Misrepresentations Related to MIS Waivers and Lender's Waiver.

Addressing Plaintiffs' second claim for relief, Plaintiffs allege that under the 203(k) Contract's draw request procedure, Debtor fraudulently mispresented on the waivers related to Draws 1 through 3 that he paid all subcontractors and materialmen before receiving draw funds. The first element of this claim, whether the debtor made a representation, is not disputed because Debtor acknowledges that he signed all waivers. Thus, the Court considers the remaining four elements.

#### a. Debtor's Knowledge of Falsity as to the Representations Made in the MIS Waivers.

The second element considers whether, at the time of representation, the debtor knew the representation was false. The representation "must have been knowingly and

fraudulently made" or with gross recklessness to its truth. *In re Harris*, 3 F.4th 1339, 1345 (11th Cir. 2021) (citing 4 Collier on Bankruptcy, ¶ 523.08[1][d] (16th ed. 2018) (collecting circuit and district court cases)); *In re Childers*, 651 B.R. 699, 722 (Bankr. N.D. Ohio 2023). "'Gross recklessness is defined as conscious indifference to the consequences (of an act).'" *In re Childers*, 651 B.R at 722 (quoting *Halpin v. Hardy* (*In re Hardy*), 553 B.R. 613, 625 (Bankr. E.D. Ky. 2016)).

The language of the MIS Waivers for Draws 1 and 2 represents that the 203(k) funds drawn by Debtor would be used to pay subcontractors and materialmen, not that Debtor had paid the subcontractors or materialmen prior to requesting the draw funds. The Court finds that based on the credible testimony of Debtor, at the time the representations were made in connection to Draws 1 and 2, Debtor intended to make such payments and believed that Plaintiffs would cover the shortages. Thus, there was no showing of knowledge of false representation in connection to Draws 1 and 2 at the time such representations were made.

> *b. Debtor's Knowledge of Falsity of Representation in Lender's Waiver.*

In August 2023, however, when Debtor signed the Lender's Waiver, Debtor did have knowledge that his representation was false, as it was made with gross recklessness to the truth. At that time, Debtor knew that he had not paid Northwest Abatement the $9,251.00 he had received from Draw 1, nor had he paid the window supplier and subcontractors for plumbing, electrical, and heating from Draw 3. Not only this, former employees Shane Murray, Josh Ord, and Laura Martin testified they had left Coba because Debtor informed them that funds were tight, Debtor was not able to pay subcontractors and suppliers on the Home and other Coba projects, and certain subcontractors and materialmen had not yet been paid the amounts owed to them. Nonetheless, Debtor signed Lender's Waiver representing that all subcontractors and

materialmen "have been paid all amounts" on the Home project.[14] His representation in Lender's Waiver was a conscious indifference to the consequences of his act, and thus made with gross recklessness to its truth. Plaintiffs have established that Debtor knew his representation in Lender's Waiver was false when made.

### c. *Debtor's Intent to Deceive under Draw 3 Was Shown under the Totality of Circumstances Due to His Reckless Disregard for the Truth.*

The third element requires Plaintiffs to show that Debtor made the false representation with the intent to deceive. Because direct evidence of the intent to deceive is rarely available, "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167-68 (9th Cir. BAP 1999). A bankruptcy court may find requisite intent "from a debtor's reckless indifference to or disregard of the truth." *In re Khalil*, 379 B.R. 163, 174-75 (9th Cir. BAP 2007) (discussing intent to deceive in the context of § 727(a)). However, recklessness alone does not equate to fraudulent intent; it is only probative of intent. *Id.* at 174. "The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to deceive" the creditor. *Id.* at 175. As the court noted in *In re McGuire*, the focus must be on "the totality of the circumstances and whether they create the overall impression of a deceitful debtor." *In re McGuire*, 284 B.R. 481, 493 (Bankr. D. Colo. 2002).

Here, under the totality of the circumstances, Debtor's gross negligence and disregard for the truth when signing Lender's Waiver under Draw 3 constituted a fraudulent misrepresentation. Debtor, at the time of making the Draw 3 request, had direct knowledge that the Home project was extremely costly, and he was aware of the consistent pattern of shorted draws and unpaid subcontractors like Northwest

---

[14] The Court interprets Lender's Waiver language to apply only to labor and materials provided under the 203(k) Contract, not labor or materials outside of the 203(k) Contract.

Abatement. Per draw, Coba was shorted tens of thousands of dollars, and Lender only disbursed funds pursuant to the 203(k) Contract's line-item thresholds. Also, Debtor had direct knowledge that the contingency was nearly exhausted by Draw 1, or at least by Draw 2, because of the Home's expenses. Debtor did not use the 203(k) Contract's draw funds to pay the four subcontractors and one materialman, although the 203(k) Contract funds were applied to the Home project. Nonetheless, Debtor obtained funds by fraudulent misrepresentation with direct knowledge that he could not pay certain subcontractors and materialmen or catch up to the project's expenses because of Lender's constant shorted draws over four months and Plaintiffs' failure to make up such shortages. Therefore, under the totality of circumstances, Debtor's disregard for the truth when signing Lender's Waiver to obtain the Draw 3 funds constituted an intent to deceive, meeting this element.

> d. *Plaintiffs Justifiably Relied on Debtor's False Representation in Lender's Waiver.*

Fourth, a creditor must have relied on the false representations by the debtor. A party does not need to prove that the reliance was reasonable. *Citibank v. Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996). Rather, reliance requires a less demanding level of justifiable reliance on a debtor's misrepresentation. *Field v. Mans*, 516 U.S. 59, 73–75, 116 S. Ct. 437, 445–46, 133 L. Ed. 2d 351 (1995). This standard depends upon the knowledge and experience of the person to whom the representations were made. *In re Storer*, 380 B.R. at 232. The qualities and characteristics of a particular plaintiff, and the circumstances of the particular case, are considered rather than of the application of a community standard of conduct to all cases. *In re Shaul* 579 B.R. at 243; *Field*, 516 U.S. at 71, 116 S. Ct. at 444. The Supreme Court further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing

> it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id.* (citing Restatement (Second) of Torts § 541 cmt. a (1977)). Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense to fraud. *In re Apte*, 96 F.3d 1319, 1322 (9th Cir. 1996).

Plaintiffs justifiably relied on Debtor's fraudulent misrepresentation in Lender's Waiver. Under the standard set forth in *Field v. Mans*, Plaintiffs had scant construction or home renovation knowledge. Plaintiffs slowly learned through the first two draws of the Home renovation process that Coba would pay subcontractors and materialmen after draws had been made. When Mr. Hale asked Debtor whether he paid the subcontractors, Debtor either affirmed that he did or he assured Plaintiffs that all subcontractors would be paid the amounts owed to them. There was no testimony that prior to or at the time of Draw 3, Plaintiffs had knowledge that certain subcontractors or materialmen had not been paid. Further, the evidence establishes that Plaintiffs, mere customers, did not display the characteristics of knowledge in construction or renovations. Plaintiffs were also preoccupied by Mrs. Hale's breast cancer and chemotherapy treatment. Considering the Plaintiffs' minimal knowledge of construction and the 203(k) Contract procedure, and Mrs. Hale's ongoing cancer treatment, Plaintiffs justifiably relied on Debtor's grossly negligent false representation when Debtor represented through Lender's Waiver that all subcontractors and materialmen had been paid for work performed on the Home.

> e. *Plaintiffs Have Failed to Establish Damages in Excess of Amounts Owed to Coba, and the § 523(a)(2)(A) Claim Fails.*

The creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with

the intent to deceive. *In re Storer*, 380 B.R. at 232 (citing *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991)). Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible. *In re Britton*, 950 F.2d at 604 (citing W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 42 at 273 (5th ed. 1984)).

Proximate cause under § 523(a)(2)(A) requires a finding by the bankruptcy court that there was (1) causation in fact, or in other words, that the debtor's misrepresentations or fraud was a substantial factor in determining the course of conduct that results in loss, and (2) legal causation, which requires the creditor's loss to reasonably be expected to result from the reliance. *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 70-71 (1st Cir. 2012). A plaintiff must show the "specific money or property" a debtor obtained by fraud that resulted in a loss to plaintiff. *In re Carlson*, 426 B.R. 840, 857 (Bankr. D. Idaho 2010).

The evidence shows that the sole source of damages for any misrepresentation under the 203(k) Contract arises out of the agreements between Plaintiffs and Coba to rehabilitate the Home. As such, to establish damages under § 523(a)(2)(A), Plaintiffs must prove that they have been damaged when considering *all* services performed and payments made in the context of Phase 1. While Plaintiffs argued that Debtor and Coba assumed the risk for expenses accrued outside of the 203(k) Contract budget, the Court finds that the 203(k) Contract did not prohibit Debtor from performing work outside the 203(k) Contract. Nor did it require that all work on the Home be strictly within the 203(k) Contract budget. Further, the credible testimony established that it was not possible to follow the constrained budget under the 203(k) Contract considering the scale of remodeling a 100-year-old home and the time constraints Plaintiffs imposed. Plaintiffs and Merrell were aware of Debtor's forewarnings about the insufficiency of funds, as well as the significant shortfall for work performed. Although costs were increasing and the budget was changing, Debtor provided invoices to Plaintiffs and communicated with them about catching Debtor up on payments owed to Coba. The Court finds that Plaintiffs'

argument that Debtor and Coba assumed the risk for expenses accrued outside of the 203(k) Contract's limited scope to be disingenuous at best.

With respect to damages, the Court finds that Plaintiffs established that Debtor failed to use funds received in Draw 1 to pay Northwest Abatement $9,251.00 for asbestos abatement completed under the 203(k) Contract and that Debtor failed to use funds received in Draw 3 to pay $21,655.04 to subcontractors and materialmen for work performed under the 203(k) Contract as follows: $7,700.00 for electrical; $8,272.50 for plumbing; $4,820.00 for heating; and $862.54 for window materials, for a total of $30,906.04. Nonetheless, Plaintiffs' claims at trial[15] are less than the $70,000 still owed to Coba for work performed on the Home, and the Court holds that under the recoupment doctrine as more fully discussed below, Plaintiffs have failed to establish the necessary element of damages to prevail on their claim for relief under § 523(a)(2)(A).

Recoupment has been described as "the ancestor of the compulsory counterclaim and setoff of the permissive counterclaim." *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d 926, 934 (9th Cir. 2020) (citing *Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1440 (7th Cir. 1993)). Recoupment, in the bankruptcy context, has been defined as the setting up of a demand arising from the *same* transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim. *Newbery Corp.*, 95 F.3d at 1399 (emphasis added).[16] Furthermore, according to Black's Law Dictionary, recoupment is right of a defendant to have the plaintiff's claim reduced or eliminated because of the plaintiff's breach of contract or duty in the same transaction. RECOUPMENT, Black's Law Dictionary (12th ed. 2024); see also EQUITABLE

---

[15] During trial Plaintiffs asserted through Plaintiffs' Exhibit 113 that their maximum damages totaled $66,619.96.

[16] The defining characteristic of setoff, in comparison to recoupment, is that in a setoff, "the mutual debt and claim ... are generally those arising from *different* transactions." *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 933 (citing *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996)) (emphasis added).

RECOUPMENT, Black's Law Dictionary (12th ed. 2024) (A principle that diminishes a party's right to recover a debt to the extent that the party holds money or property of the debtor to which the party has no right).

One significant difference between setoff and recoupment is that in the fight between reciprocal obligations, the doctrine of setoff is offensive in nature and can result in an affirmative judgment in favor of the party to whom the greater obligation is owed. *In re Thomas*, 529 B.R. 628, 637 (Bankr. W.D. Pa. 2015). Alternatively, recoupment is an affirmative defense, and this equitable doctrine merely seeks to adjust downward the amount of the plaintiff's demand in light of the reciprocal demand of the defendant. *Id.* at 638; *see e.g., Anthem Life Ins. Co. v. Izaguirre (In re Izaguirre),* 166 B.R. 484, 490–93 (Bankr. N.D. Ga. 1994).

In addressing whether the countervailing claims or rights asserted by the creditor arise from the same transaction or occurrence under the doctrine, the Ninth Circuit has "held that the crucial factor . . . is the 'logical relationship' between the two.'" *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934 (9th Cir. 2020) (citing *In re TLC Hosps., Inc.,* 224 F.3d 1008, 1012 (9th Cir. 2000)). Most recently, the Ninth Circuit reiterated:

> The test remains whether the relevant rights being asserted against the debtor are sufficiently logically connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction. *Sims*, 224 F.3d at 1012; *Newbery*, 95 F.3d at 1401-02.

*Gardens Reg'l Hosp.*, 975 F.3d at 924. In applying this standard, "courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." *Id.* (quoting *5 Collier, supra,* ¶ 553.10[1]).

The Supreme Court in *Moore* held that a "'[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *In re Madigan*, 270 B.R. 749, 755 (9th Cir. BAP 2001) (quoting *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S. Ct. 367, 70 L. Ed. 750 (1926)); *see also Albright v. Gates*, 362 F.2d 928, 929 (9th Cir. 1966); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934; *Newbery*, 95 F.3d at 1402. The Ninth Circuit also cautioned that "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction," *Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 975 F.3d at 934; *In re TLC Hosps., Inc.,* 224 F.3d at 1012.

Here, Debtor raised as a defense to Plaintiffs' claim for damages that Coba was still owed more than $70,000 at the time he was fired. The Court must determine whether the logical relationship test is met between Plaintiffs' claim for damages and Debtor's and Coba's defense claim for unpaid work. Looking at the totality of the record, the Home project's Phase 1 was a single transaction from which Debtor's and Plaintiffs' claims arose. Phase 1 was comprised of the 203(k) Contract, the initial funding agreement, and the necessary work outside of the 203(k) Contract, which was contemplated by the parties. All agreements were a series of occurrences that logically connect to Phase 1's completion, and all the work thereunder was performed during the same time period. Debtor and former Coba employees also understood Phase 1 to have parallel paths. Additionally, all work performed for Phase 1 was invoiced together by Coba. Because all work, whether under contracts or supplemental to them, was incorporated and

intertwined for the common goal of completing Phase 1—a single transaction—Plaintiffs' claim for damages under the 203(k) Contract is logically related to Coba's recoupment defense based on unpaid work done on the Home outside the contracts.

Having determined that Coba's recoupment defense is logically related to Plaintiffs' claim for nondischargeable damages under the 203(k) Contract, the Court concludes that the equitable recoupment doctrine should be applied in this instance, as it would be unjust for Plaintiffs to retain the benefit of Debtor's and Coba's work on the Home without paying for it. The Court also finds that based on the evidence in the record, Coba is owed at least $70,000 for work performed on the Home in Phase 1, outside the 203(k) Contract and initial funding agreement, which was contemplated by the parties. Accordingly, because Plaintiffs owe more for work performed on the Home in Phase 1 than Debtor owes on its nondischargeable debt arising out of the 203(k) Contract, and all damages Plaintiffs seek arise out of Coba's work on the Home, the Court finds that Plaintiffs are not entitled to any damages.

The Court recognizes that the Ninth Circuit has ruled that equitable remedies, such as recoupment, may not be invoked to compensate someone who has engaged in inequitable conduct. *Cooper v. Soc. Sec. Admin.*, 131 F.4th 995, 1011 (9th Cir. 2025); *Aalfs v. Wirum* (*In re Straightline Investments, Inc.*), 525 F.3d 870 (9th Cir. 2008). Generally, a person seeking equitable relief must have clean hands. *In re Pac. Nw. Storage LLC Income* 386 B.R. at 776 (citing *Investors v. Shelton*, 3 Wash.2d 599, 602, 101 P.2d 973, 974 (1940)). The Supreme Court has emphasized, however, that the doctrine of unclean hands "'does not mean that courts must always permit a defendant wrongdoer to retain the

profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law.'" *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (quoting *Johnson v. Yellow Cab Transit Co.* 321 U.S. 383, 387, 64 S. Ct. 622, 624–25, 88 L. Ed. 814 (1944)). More so, *Northbay Wellness Grp., Inc.* states "[r]ather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right.'" *Northbay Wellness Grp., Inc.*, 789 F.3d at 960 (citing *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963). The "clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest." *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991); see also *Northbay Wellness Grp., Inc.* 789 F.3d at 960 (where the Ninth Circuit reversed the bankruptcy court because it failed to conduct the balancing test and weigh the parties' respective wrongdoing, which was an error of law that abused discretion).

Balancing the finding of Debtor's false representations under § 523(a)(2)(A) with Plaintiffs' retention of the reasonable value of services for unpaid work on their Home, the Court finds that the equities weigh in favor of allowing Debtor and Coba to recoup the nondischargeable damages. To support this finding, the Court again emphasizes the following: Merrell's approval when inspecting the Home; Debtor's completed work that was consistent with what the 203(k) Contract required; Plaintiffs' failure to remit $10,000.00 to Debtor and Coba as initial funds to supplement the insufficient 203(k) budget; Plaintiffs' acknowledgement of invoices and their communication with Debtor

about catching him up on payments; the credible testimony of several witnesses, including Debtor; Shane Murray's testimony that all work performed, including the work not contracted for, was necessary to complete Phase 1 concerning the Home's structure and safety; Debtor's good faith effort in attempting to address the structural needs of renovating the 100-year-old Home; and Debtor's willingness to continue working despite the significant short falls and Plaintiffs' nonpayment of amounts owing to Coba under the initial funds agreement. The Court holds that the balancing test set forth in *Northbay Wellness Group* weighs in favor of Debtor, and Debtor's false misrepresentation under § 523(a)(2)(A) is not a basis to preclude recoupment.

In conclusion, Plaintiffs' claim for relief under § 523(a)(2)(A) is denied based on Plaintiffs' failure to prove damages.

## F. Plaintiffs' Attorney is Not Entitled to Recover Prepetition Attorney's Fees under the 203(k) Contract or Lender's Waiver Language.

Plaintiffs' attorney seeks attorney's fees pursuant to the 203(k) Contract and Lender's Waiver. Section 3 of the 203(k) Contract states:

> The contractor will indemnify and hold harmless the owner from and against all claims, damages, losses, expenses, legal fees or other costs arising or resulting from the contractor's performance of the work or provisions of this section . . . The contractor is responsible for, and indemnifies the [o]wner against, acts and omissions of employees, subcontractors and their employees, or others performing the work under this [a]greement with the contractor.

Pls.' Ex. 1:2. Section 9 of the 203(k) Contract states:

> Final payment will be due after complete release of any and all liens arising out of the contract or submission of receipts or other evidence of payment covering all subcontractors or suppliers who could file such a lien. The contractor agrees to indemnify the [o]wner against such liens

and will refund all monies including costs and reasonable attorney's fees paid by the owner in discharging the liens.

Pls.' Ex. 1:3. Lastly, Lender Waiver's states that the contractor:

> hereby agrees unconditionally to indemnify [b]orrower and hold [b]orrower harmless from and against all liability, loss, cost, or expense (including, but not limited to attorney's fees) now or hereafter incurred, paid, or suffered by or asserted against [b]orrower or any of [b]orrower's property because of any claim or action by [c]ontractor with respect to the claims, liens, and rights herein waived and released or arising out of any breach or untruth of any warranty of representation made.

Pls.' Ex. 55. These are the only contractual attorney's fees provisions Plaintiffs' attorney points to for a claim of trial related attorney's fees.

There is no general right to recover attorney's fees under the Bankruptcy Code. *Renfrow v. Draper*, 232 F.3d 688, 693 (9th Cir. 2000). Here, Plaintiffs cannot obtain attorney's fees under the 203(k) Contract, Lender's Waiver, or any fees related to the adversary proceeding. While it is undisputed that a lien on Plaintiffs' Home was filed by Northwest Abatement in the amount of $33,600.00, and that Debtor did not pay four subcontractors and one materialman, the Court holds that Plaintiffs are not entitled to attorney's fees for the following three reasons.

First, Plaintiffs' statement of damages did not list any attorney's fees for the prepetition lien removals or actions against Plaintiffs relating to the Home project. The Court finds that damages pertaining to these attorney's fees should have been clearly listed in the Plaintiffs' statement of damages as pretrial damages incurred by Plaintiffs in connection with Debtor's representation concerning the payments of certain subcontractors or materialmen. *See generally* Pls.' Ex. 113.

Second, all the fee provisions are narrow in that they provide only that Debtor will indemnify Plaintiffs for lien removal or third-party actions against them relating to work on the Home within the 203(k) Contract's scope. The cited provisions do not provide the right to attorney's fees generally for litigating breach of state law contracts between

Plaintiffs and Debtor, or nondischargeability claims. Nor do they contain a prevailing party provision under RCW 4.84.330.

Third, even if there was a prevailing party provision, the Court holds that based on its ruling, Plaintiffs are not a prevailing party. Therefore, Plaintiffs' claims for attorney's fees under the 203(k) Contract or Lender's Waiver are denied.

## IV. CONCLUSION

Plaintiffs' claims for relief under § 523(a)(2)(A) are denied based on Plaintiffs' failure to establish the essential elements of such claims. Additionally, Plaintiffs' claims for attorney's fees are denied.

/ / / End of Memorandum Decision / / /